Thank you, Your Honors, and may it please the Court, Rinaldo Fuentes, U.S. Department of Labor. The Department is reserving four minutes of rebuttal time. The District Court erred in this case for one clear reason. They found that there were no genuine disputes of material fact regarding the issues presented, but the Department presented a clear alternative rationale here that there were reasonable disputes, genuine disputes of material fact regarding the reasonableness of the employer's unwritten automatic meal break deduction policy. The Department presented evidence to show that many nurses who worked at Levering's correction forms therefore could not have complied with the automatic meal break deduction policy. In addition, there were multiple employees who indicated that they would fear negative reactions. Was it really many? I thought it was, like, ultimately five out of 60 or something. It's correct, Your Honor, that there were five employees after the interview indicated that they were unaware of the timesheet deduction policy, but Levering also admits only 19 of the employees who were interviewed by the Department actually referenced the timesheet correction forms. So we view this as really representative evidence, as about 25 percent of the employees who were asked about the timesheet reduction form indicated that they were not aware of that form, therefore they could not have complied with the policy. So does that mean that the others weren't asked the question? That seems odd. It seems like you would have asked that question. Not you, but the investigator. So in the course of the interviews, we asked numerous questions of employees. So, for example, if you look at some of these employee statements, we asked about whether or not there were indications of child labor, whether or not there were improper deductions from pay. So there are numerous other questions that are being asked, but the investigator, when they're asking these questions, maybe they come upon them in the middle of an investigation and realize, oh, there are additional questions to be asked, and continue asking those questions from an additional subset of employees. But again, as Levering indicates, 25 percent of the employees who indicated that they were And this is what distinguishes this case from the other timesheet deduction cases that we set in our brief. Counselor, if I could back up just a minute. Of course. I'm having trouble seeing how that creates a genuine issue of material fact, just because a few of the employees said they weren't aware of the policies when most of them were. How does that raise a genuine issue as to Levering's evidence? Of course. It raises a genuine dispute of material fact regarding the reasonableness of the policy. And as we indicate in our brief, and as the employers indicate, the cases that they rely on, Allen, Forrester, Hertz, White, those are cases where their knowledge of the timesheet deduction policy is not at issue. And in fact, Allen, in footnote five, indicates that if employees were not aware, that would lead to a conclusion that there is a factual issue related to reasonableness of the employer's policy. And the Sixth Circuit in Craig, that issue, that very issue was presented at summary judgment and the court said the proper remedy there was to remand. Because that was an open issue of material fact that should be resolved by a trier effect. Does that go to the reasonableness of the policy or the adequacy of the instruction? Perhaps to both. We are arguing here it goes to the reasonableness of the policy. And as Allen indicates, that it clearly, an employer exercising reasonable diligence would ensure that employees know about the policy. In fact, we can construct really three ways in which a policy can be reasonable or where you would suggest that it wouldn't be reasonable, would be if the employer discourages use of the form, if employees are not aware of that form, or if it's not available for them to use. And so those are issues where we can recognize reasonableness is a factual question. And that's also what Allen recognizes. These are clear factual questions that should go before a trier effect. And that's where the district court respectfully erred by jumping ahead and concluding, well, this was a reasonable policy and therefore, anybody who wasn't then telling the employer, they would not be able to know, or Levering would not be able to know that they were working compensable time. But here, it would be impossible to comply with a policy you had no awareness of. This was an unwritten policy? Correct. Levering indicates that they maintain no employee handbooks, they maintain no record of that information. And we'd also point out that there's no record of the timesheet correction forms during the period of investigation or acknowledgment forms. And so there's a lack of records, both that predate the period of investigation or that were created during the period of investigation to verify that that policy was, in fact, in  When you say the forms, you're talking about the investigative period of time. There are no forms that were filled out by the Levering employees, is that what you're saying? Correct. Not a single form was available. We requested them through the course of discovery, and Levering was then able to produce them. But then later produced 883 forms that came after our period of investigation to indicate that they had a policy in place. That, it seems to me, is your better argument. Was there any explanation for that provided? As we understand it, Your Honors, and maybe Levering can clarify this in their argument, that it was an HR mishap, that they lost the records during the course of that period of investigation, so they had none available. We'd indicate that that clearly maybe stands for another piece of this puzzle, a constellation of evidence to show that this was not a reasonable policy that was diligently maintained by an employer who wanted to comply with the FLSA. And we'd connect that again to the fact that some employees didn't know, and then additional evidence that employees felt discouragement from submitting those forms or felt that it would be futile to do so. And then combine that with the fact that in almost every one of the interviews that are investigator took, employees indicated that they worked through their meal periods frequently, 15 of whom said that they not once, not a single time working at Levering, were able to get an uninterrupted meal break. Back to this form, and I apologize for going backwards here, but is there in the record a blank form for during this investigative period of time? Did it exist? Is there evidence that this form existed during that time, or is that just assumed that it existed? Everybody understands that it did. Yes, Your Honor. We don't dispute the existence of the forms. In effect, we understand that many employees recognize that a form perhaps did exist. And so that's not what we dispute. What we say is that it lends further credence to the fact that this was not a reasonable or a diligent policy maintained by the employer. It just wasn't used. You don't have evidence of the form being filled out and used. Correct, yes. We don't have that evidence. But there is evidence in the appendix of those records that come after the period of investigation. And so if we... Oh, forgive me. Back to, you said the evidence of employees working through lunch. Was there evidence that they were working through lunch during the audit period? So what we have are witness statements saying that they never received an uninterrupted meal break for the entire time they worked, which would include the period of investigation. Now, every individual witness didn't identify very specific, granular points in time when they did not receive that time. And in fact, that wouldn't be their burden to do so when there is a lack of payroll records. And that's the burden-shifting argument that the district court alluded to. But here, we connect both the constellation of facts that this was not a reasonable policy, that there are factual questions, a genuine dispute of material fact that should preclude summary judgment at this stage, but also constructive... That the employer could not help but be constructively aware that work was being performed because of the operational characteristics of the nursing facility. It's a 24-hour, seven-facility. They require nurses to be present and on the floor at all times to ensure coverage for patient care. And they know that there are going to be uninterrupted meal breaks, but there's not evidence in the record to show that they were able to take those meal breaks. But in fact, it's the policy as a whole. If the policy is in place, is reasonably and diligently implemented, then perhaps the employer would not have constructive knowledge. Because we agree with Alan that reasonable diligence does not equate to omniscience. And we're not requiring employers to know every single thing that an employee is doing at all times. But if they implement this policy and then allow many employees to go without awareness or allow an environment where employees feel discouraged, then the employer could be constructively aware that they're working through their meal breaks. What if the... This kind of may be an odd question, but if it's a reasonable policy, you've got a reasonable policy in place that everybody agrees is in the handbook for employees, for example. But the employer also knows that a lot of their employees are working through lunch and not submitting those forms to get reimbursed. Is that just on the employee then? In other words, you've got a combination of a reasonable policy everybody knows about, but you've got knowledge on the part, at least constructive knowledge on the part of the employer. Is that just on the employee that's like, well, they know that they're not paying you, but you didn't ask for the payment? What happens there? No, Your Honor. White actually lays out the scenario that there are two different ways for an employer to have knowledge. Constructive knowledge that work is being performed, and that's where we would rely on the basic suffer permit standards of the FLSA. But then actual knowledge. Even if you had a reasonable policy in place, if you then become actually aware that people are working through uncompensated meal periods, then that time must be compensated. So the employer in that situation has to take the initiative to say, hey, here's the form. Go fill that out. We need to pay you? Yes, or ensure that the employee were to receive overtime premiums. That's correct. So throughout all of this evidence, again, the Department stresses that at this juncture, at a juncture when the employer moves for summary judgment, that there are no disputes of material fact. When we have presented those facts, that's why we are simply asking for the basic summary judgment standard to apply. That these disputed facts, these genuine disputes of material facts should be brought back to a trier effect, because they clearly indicate clearly that there wasn't a reasonable policy that all employees were aware of. Some were discouraged or felt like it would be futile to submit the forms. But also that the employer is constructively aware because of the operational characteristics of its facility. Let me ask you, in the absence of the forms during the audit period being produced, did the Department or the defendant, did anyone make any effort to go back and compare payroll records during the audit period with payroll after the audit period to see if there was an uptick in the amount of overtime being paid or anything like that? Well, to your honest question. Do you understand what I'm asking? Yes, absolutely. To your honest question. We would say that Levering did comply. In many cases, there isn't that type of compliance. But Levering did comply, provided its payroll records and provided that information. They were unable to produce a single timesheet correction form that I think would aid in that sort of audit. But that was not the type of audit that was performed in this case. And because the employer bears the burden of maintaining the records on its case, and that's why they would need to present that evidence.  If the amount of overtime paid during the audit period was essentially the same as the amount in the post-audit period when there were forms, then maybe that might lead to a conclusion that they were paying it before. But you're saying we don't have that kind of analysis. Not in this case, no, Your Honor. Okay. Thank you, Your Honor. I see I'm in remodeled time, so I'll reserve that time. Thank you, Your Honor. Very well. Thank you. Good morning. Good morning. Good morning, Your Honors. May it please the Court, my name is Andy Mortone. I represent the defendants in this case of Levering Regional Health Care, which is a management consulting company that works with health care providers. Seated at Council table with me is Abigail Schwab, my colleague. As Your Honors probably have surmised by now, she did the heavy lifting in terms of the briefing and everything on this case. Your Honors, this is a case under the Fair Labor Standards Act. The first thing to note is that despite interviewing 46 employees and despite years of discovery, the Secretary could not produce a single scintilla of evidence that a single employee of Levering worked through their lunch period without being properly paid for it. Statements in the record such as, we always, we never, are not sufficient evidence as a matter of law to support a claim under the Fair Labor Standards Act. In this case, the Secretary has an initial burden of proof that has two phases. The first phase is the Secretary must prove that employees worked for time for which they were not compensated. That's the threshold burden of proof. The second thing the Secretary must prove is that the employer either knew or should have known that employees were working through their time without being paid for it. To meet this first element, the Secretary had to adduce evidence that there was a specific amount and extent of overtime work. That's from the Holloway case, Your Honors. So in other words, simply saying we never get lunch, we always work through lunch, that evidence does not meet the Eighth Circuit tests established in both Rapp and Holloway. So if I say I've worked for three years at this place and here's how many days I work per week with however many weeks of vacation and there's not been one time that I got my lunch, that's not enough? That would not be enough under either Holloway or Rapp. So I have to, would I have to list out each of the dates? There would have to be specific evidence of some of the dates, Your Honor. What if you had the dates that I worked? Me having the dates you worked is not the same thing as having evidence that you worked and were not properly paid. Except my telling, except my saying it? The general statement I never got paid is not sufficient under the law, Your Honor. You have to identify specific times. So tell me what, okay, I worked for three years and you have my work schedule, and I say I never, I always worked through lunch. I never had a lunch break. What else do you need from me, the employer? I mean, I'm sorry, the employee. The employee would have to come up with specific evidence. For example, on the week of January 10th, I worked through lunch on this day, this day, this day, and this day. The court specifically rejected the I never got a break, I never got a lunch break analysis in both Rapp and Holloway, Your Honor. It's not enough to simply say I never or I always work. There has to be specific evidence of a specific amount of overtime. Always and never aren't sufficient to meet the evidentiary standard. To meet the second element, the defendant has to have either actual or constructive knowledge that employees were working without being paid. In this case, there is no question that the defendant did not have actual knowledge. The evidence in the record is clear. The second thing, the way that the plaintiff is approaching it in this case, is that they're asserting that, in this case, Levering had constructive knowledge that its employees were working through their lunch or through their break periods without getting paid. As an initial matter, our temporary time card policy is, on its face, a reasonable policy. The policy is if an employee works through their break time and they can't find someone else to fill in and work during that, or can't find someone else to fill in to permit them to take a break, then the next step in the process is they pick up a temporary time card sheet, which the record shows were kept by the time clock. They fill out that sheet. They have their supervisor sign off on it. It's presented to payroll, and they get paid. That is a prima facie legal policy. It's a reasonable policy. But isn't it a reasonable inference that none, zero, were produced for the audit period and 800 were produced after that? Wouldn't it be a reasonable inference that the system wasn't used during the audit period? In this case, I don't believe that's accurate for two reasons, Your Honor. The first reason is that, in this case, the records were simply lost. Our HR director quit in the middle of the pandemic. And I agree with counsel for the secretary. We simply couldn't find them. The fact that we were unable to locate records does not prove that the records never existed. The district court correctly held that there was no evidence presented by the secretary that a single temporary time card sheet was turned in during this period. The second... Well, okay, isn't that the point, though? If none were turned in, the system's not being used, and it's not an effective system. Well, there was no evidence that none were turned in, Your Honor. The evidence was we couldn't find them. And in this case, the secretary would have had to provide evidence that someone turned it in or someone attempted to turn it in. We were unable to locate the records. That doesn't prove that there were no records. It simply proves we couldn't locate them. And so, in this case, the second influx of time sheets, the 833 time sheets, came during the pandemic when nursing homes were categorically short-staffed across the country, when health care workers were sick and unable to work, when there was a lack of personal protective equipment. Relatively late in the pandemic, though, right? I mean, we're not talking in the summer of 2020. Aren't we talking 2022? We're talking March of... Actually, the audit period itself ran from February of 2018 to February of 2020, Your Honor. The audit started in May of 2020, in the heart of the pandemic. No, I'm sorry. I was talking about when the 800 forms came. I thought there was a specific time period for those 800 forms. I believe that the record shows that they came in in the four-month period after the audit started. In what year? Do you remember? That would have been 2020, Your Honor. Okay. I have the wrong year then. And I don't have the appendix with me, Your Honor, so I can't cross-check it. My apologies. With regard to the issue of constructive knowledge, the first argument that the Secretary makes is employees were not aware of the policy. The record is unequivocal that employees were in-serviced on the policy. Employees learned of the policy during orientation. The Secretary interviewed 46 of Levering's employees during the pandemic. Out of those 46 employees, 27 of them were not even asked whether there was such a policy. And so that shrunk our sample size down to 19 employees. Out of the 19 employees who were actually asked the question, 14 of the employees were aware of the policy. And so in this case, the Secretary's own evidence, the limited interviews that the Secretary puts forward, shows that the employees were aware of the policy. The vast majority of them were. And so if the policy was not trained and in-serviced, those 14 people would not have been able to know about it. Clearly the policy existed. The second way that the Secretary asserts we had constructive knowledge in this case is the Secretary asserts that employees were discouraged from using the temporary time card policy. Again, the Secretary has absolutely no evidence that any employee interviewed was discouraged. The statements that are issued are statements like, they frowned upon us or they yell at us. And the district court properly found in an evidentiary ruling that these statements are too ambiguous and too general to support a claim of discouragement. Under the law, the employer has to do the discouraging. And whether or not employees think that the employer frowns on a policy, even though the policy is given to them in both in-service and during orientation, that is not the determination. The determination is did the employer do something to discourage it. And in this case, the district court properly ruled that the Secretary could not produce admissible evidence. Because again, evidence like they yell at us or everybody knows is not admissible evidence of a violation of the Fair Labor Standards Act. And so in this case, that was the district court making an evidentiary ruling. And the district court's evidentiary rulings are subject to an abuse of discretion standard. Finally, the third argument that the Secretary makes that we should have known that employees were working through their meal periods was that we were short-staffed. And as your Honor's questioning indicated, the Secretary has conflated two periods of time. The period of time of the audit period was February of 2018 through February of 2020. The Secretary's evidence shows that we were short-staffed, and I'll quote from the appendix, the facility was lacking staff since many nurses were out due to COVID-19. Right now, in the heart of the pandemic, we are down nurses. Right now, we have no one to cover because so many people are out sick. Again, the Secretary bears the burden of proof with regard to constructive knowledge. And on that element, the Secretary has to prove we knew or should have known. The Secretary has offered not a scintilla of evidence that during the audit period, levering was short-staffed, your Honors. And so from that perspective, we established the existence of a lawful policy. And there is no, and was no, admissible evidence presented that the employees were discouraged, that the employees did not know about the policy, or that we had constructive knowledge because we were short-staffed during that period of time. Didn't some of the people interviewed say, well, I had a certain floor always has to have, it's only got one person, somebody always has to be on a floor with certain patients, and so I would have to go in and take somebody's place if they were gone. That's a little different than short-staffed, but wouldn't levering have knowledge of that? That's not knowledge that someone worked without being paid, though, your Honor. Noel, we're talking about the knowledge of kind of the operations and how levering worked, which is then the inference that they knew because they were short-staffed. But isn't there something to those individual statements? Those individual statements don't prove that individuals worked and were not able to take breaks or were not able to find people to cover them so they could take breaks. I'm sorry, maybe I'm not making my point clear. I thought that the idea was that levering understood how its business operated, very busy, always had to have someone replacing another, floors couldn't be empty, and that that way there would be constructive knowledge of the inability to take a lunch break. So that's what I'm sort of analogous to the idea that we were short-staffed, so there, of course, you'd have to know that people weren't taking breaks. Isn't that sort of an alternative way of getting that evidence in? I don't believe so for two reasons, your Honor. First, even if an employee has to miss or interrupt their meal period in order to cover somebody else while they're going on a meal period or while there's a code on a patient, they can still take time off, either by finding other time during the day where they could take a break or by simply interrupting their break for ten minutes or less. In this case, the Secretary's investigator, Ann Thomas, admitted that she did not ask any employee if they were interrupted, but asked if they were then able to go back and take a break or find another break time. Is that part of the record, that Levering has a policy that if you missed your lunch break, you can take it, like, leave 20 minutes early or take it three hours later? It's not a policy, your Honor. It's simply employees working to cover for each other. There's also no evidence that employees were not permitted to do it. Although it's not on the record, I can represent that happens in every health care facility in the United States where employees cover for each other during gaps, and then they find time to essentially spell each other. The second thing, though, to keep in mind is that in order to prove constructive knowledge, the knowledge that the employer has to have isn't this employee worked through their break. The knowledge that the employer must have is this employee worked through their break and was not paid. The and was not paid is also part of the element. In that case, the secretary has to prove the employer knew the employee was not paid. Was there any analysis, as I was asking the department, was there any analysis done of the amount of overtime paid during the audit period versus the post-audit period when we have the 800 forms? I don't think we can analyze that fairly, your Honor, because that's apples to oranges. Clearly, overtime shot up during the pandemic when we became severely short-staffed, like every other nursing home in the country, and so I don't think that's a fair comparison. Yeah, but if there was zero during the audit period and a lot after that, then it might lead to an inference that the system was never used, right? There's no evidence that the system was never used, your Honor. The only evidence is we couldn't find the forms after our HR director quit. Well, it is a little suspicious that all of a sudden they show up. I don't think it's suspicious, your Honor, because they showed up because everybody was working as hard as they possibly could and sleeping in the facility to care for people during the pandemic. I think that that was a national health crisis we haven't seen in 100 years. It was particularly acute in the extended care business. And so as a result of that, it absolutely taxed us to our limit. And so I don't think it's fair to compare that period of time to the period of time that preceded the pandemic because they were night and day. And so in this case, your Honors, the district court properly ruled that the secretary failed to meet both of her burdens of proof. First, the secretary failed to meet her burden of proving that employees worked without getting paid. There's not a single piece of evidence that directly shows any employee worked without getting paid, and the everybody did it or I never was paid is not sufficient under the law. Second, the secretary failed to carry her burden of proof that Levering had constructive knowledge of it because we had a lawful policy and the employees knew about the policy and there was no evidence we discouraged them from following it. Thank you. Thank you. Thank you, Your Honors. So we can see from Levering's presentation the evidence that, as we mentioned in our briefing, that this is really an attempt to convert a summary judgment motion to a hearing on the merits of the case. The department represents that we do maintain a burden to show that employees work compensable time, but the district court here really relied on the fact that the employer did not have constructive knowledge. The district court's conclusion was it did not have constructive knowledge because it believed that the employer's policy was a reasonable one and that awareness of the policy was insufficient to overcome evidence that employees were trained. But the district court then goes on to say we must present additional evidence to show that employees reached out and asked about the policy. That's only the case if that policy is not reasonable or if the policy was reasonably implemented, and here that is our argument. But to Judge Gwinder's questions really about the summary judgment standard, the employer is asking for inferences in its favor, which is the reverse. As the moving party, moving for summary judgment, those inferences should be cast in favor of the non-moving party, and here the department. And here, inferences related to the lack of timesheet correction forms. We add to that the lack of any acknowledgment forms. Their own deponents recognized that they would have forms showing that employees signed a form saying that we know about the policy, we know how to use it, we know when to use it. None of those forms were submitted during the investigative period, yet 60-some-odd of those forms were then presented to the department in discovery after the period of investigation, all dated after that period of investigation. So we see this clear theme around inferences, and those are inferences as well about discouragement. I'm sorry, the staffing levels of the facility. Levering appears to argue now that inferences about all of its staffing are all to be concluded to be relevant to the period of the COVID pandemic. Yet several of the employee statements, and we mentioned this in our reply brief, several of those employee statements don't mention the pandemic and don't mention this current period of time that they're being interviewed. In fact, represent a global concern. Nurses are never able to take breaks. I'm never relieved when I work on an overnight shift. And so those lead to a clear pattern, a clear linkage of inferences to show that this was not a reasonably maintained policy, one that a reasonably diligent employer would want their employees to know how to use this policy, to use it appropriately, and to use it without any fear of discouragement or that if they would be properly paid if they concluded and followed forward. So you can see from this constellation of evidence again that the department has presented a case that this was not a reasonable policy, one that would really give the employer knowledge that employees were working overtime. And so that's why we also conclude as well around this argument related to constructive knowledge, that they maintain control over the operational characteristics of their facility and maintain and staff at a degree that they would know that that work is being performed. And so really two arguments here, that it was not a reasonably maintained policy, so the employer can't disclaim constructive knowledge, and they likely have constructive knowledge because of the existence of the operational characteristics of their facility. As I understand Mr. Martone's argument, even independent of the policy, he claims that you don't have evidence of specific employees on specific days working through lunch at that specific time and not taking a break later and then not being paid overtime. What's the department's response to that? Well, with respect to Mr. Martone's argument, I think he elevates this standard. The employee is not required. So let me step back. When the employer does not maintain records sufficient to indicate the amount of compensable time an employee has worked, then the employee can come forward and show that they can make a just and reasonable inference from the statements they make that they did work that time. And then it's the employer's burden to rebut that information. So this burden-shifting framework works forward. And as we noted in our brief, the district court really conflates those two issues, and we think it's dicta related to that issue. They're really talking about the employer's constructive knowledge. But to the extent the department is prepared and does present evidence to show that employees did say they lost their breaks, they missed their breaks, many who were unable to take a break at any point in time. And while it's true in RAP where a single nurse working as a home health aide said, well, I probably worked a lot of that time, that is distinguishable from the case here where we have consistent patterns of statements from multiple employees indicating that they never took their breaks. And these are employees who could then come forward at trial as witnesses and through cross-examination and adversarial process at trial to indicate what kind of just and reasonable inferences we can draw from that testimony. And so forgive me, I know that I'm over time. Thank you, Your Honor. Thank you. The court appreciates both counsel's appearance and arguments. The case is submitted and we will issue an opinion in due course.